DAVID HEARD *vs.* CHARLES P. TALBOT & another.

A purchaser, from the Proprietors of the Middlesex Canal, of their lands, and the mills purchased and held by them under the *St.* of 1798, *c.* 16, and now sold subject to an express reservation of all rights necessary or incident to the preservation and use of the canal, is not liable to a complaint under the mill act for the subsequent flowing of land by such mills, if the franchise of the canal corporation has not been surrendered, forfeited or extinguished, although the canal has been abandoned and become unfit for use.

COMPLAINT under Rev. Sts. *c.* 116, for flowing land. The parties, for the purpose of submitting to the court the right of the respondents to maintain this dam, as successors of the Proprietors of the Middlesex Canal, agreed upon the following statement of facts :

" The complainant has the fee in certain meadow lands in Wayland, described in his complaint, which lands are alleged to be flowed by the water of the Concord River, raised by the respondents' dam in the operation of their mills.

" The respondents claim a right to now maintain their dam without payment of damages, (even if the dam shall cause said lands to be flowed,) by reason of the following acts and proceedings done and had by themselves and those under whom they claim.

" In 1708 the town of Billerica granted to one Richardson a certain tract of land, and a right to dam Concord River at the falls in that town, for the purposes of a grist mill, so long as he or his heirs should furnish a mill there to grind the grain of the

10 *

inhabitants of said town.   In pursuance of said grant, a grist mill, within a year or two of the grant, was erected there, with a dam of a certain height, which mill and dam and other mills were kept up and in operation till and since the incorporation of the proprietors of the Middlesex Canal, as hereinafter set forth. No forfeiture is claimed by the town of Billerica or by the complainant for any want of a grist mill for the inhabitants.

" Certain persons were incorporated as ' the Proprietors of the Middlesex Canal,' by *St.* 1793, *c.* 21, for the purpose of cutting a canal to unite the water of the Merrimack River with the water of Medford River, with certain rights and privileges given them by their charter.

" The proprietors in 1798 purchased said mill privileges on the Concord River, and erected a dam, as the complainant alleges, to a greater height than the former dam, for the purpose of raising a head of water to supply their canal, using the surplus to operate their mills, the grist mill having the first right.

" In 1804 they completed their canal from Merrimack River to Charles River, and opened it for public navigation, taking toll therefor, and using the head of water so raised in Concord River to feed their canal, and the surplus also to run their said mills.

" In 1798 the proprietors procured an additional act to be passed (*St.* 1798, *c.* 16,) by which they were empowered to purchase and hold any mill seats on the waters connected with their canal, and to erect mills thereon.

" Said proprietors rebuilt the grist mill and mills for manufacturing lumber, and leased and sold water power at said Billerica, from time to time, so long as they were in active operation as a canal company, to divers persons, to be drawn from the head of water raised by said dam, and always to be used in subordination to the use of the water for feeding the canal, except the grist mill, which always had the first right to the use of the water.

" In 1826, finding their dam insufficient to raise the water for their purposes, said proprietors built a new and more permanent dam, in connection with the old one, which is the structure here complained of.

" The proprietors carried on their canal, using in the dry seasons of the year all of the water of the river, for their various purposes and for the mills of those claiming under them, the canal using the largest part thereof and retaining the first right thereto, till the year 1851, when their canal was wholly disused by them and filled up in parts of it, and has become now wholly unfit for use, and is no longer filled with water, and is wholly unused by said proprietors.

" At the time of the abandonment of the use of their canal, and as a part of the winding up of their affairs, the proprietors sold all their land and the residue of the water power by them unsold, raised by their dam aforesaid, to the respondents by deed of quitclaim, ' subject expressly to the reservation of all easements and services necessary for or incident to the preservation and use of said canal for the purpose of navigation, and of all the rights of the public therein, until the same shall be lawfully discontinued'; and the respondents have since that sale maintained and kept up the water by said dam for manufacturing purposes, and claim to use the same in such manner and to such extent as may suit their convenience for such manufacturing purposes, subject to said reserved right of said canal.

" It is also agreed (if it be competent evidence) that after the abandonment of their canal said proprietors applied to the legislature for leave to wind up their affairs, and to sell their land and water power, and surrender their charter, which application was denied; and that afterwards they applied by petition to the supreme court for leave to wind up their affairs and surrender their charter, which petition is still pending; which applications were made after the deed to the respondents.

" It is also agreed (if it be competent evidence) that the canal corporation, or those claiming under them, have never in fact paid any damages for flowing the complainant's land, or obtained any grant or license therefor, except such as may be presumed by law from the lapse of time from the facts above stated.

" It is also agreed (if it be competent evidence) that the complainant's ancestor brought his complaint against the proprietors

of the canal, as reported in the 5th of Metcalf's Reports, page 81, which may be referred to.

" It is also agreed that said canal corporation have never been dissolved, or said canal discontinued, except as aforesaid.

" If the said complaint can be sustained upon the aforesaid facts, and upon the proof by the complainant that the dam built in 1798 or in 1826 was higher than the dam maintained up to 1798, and that his land is flowed thereby, then the cause i to stand for trial; otherwise, the complainant is to become non-suit."

This case was argued at October term 1855.

*B. F. Butler*, for the complainant. The proprietors of the Middlesex Canal, by their charter, took the right of flowing land for the specific purpose only of filling their canal. *St.* 1793, *c.* 21. No other purpose is mentioned. This was within the rightful exercise of the power of eminent domain. *Sudbury Meadows* v. *Middlesex Canal*, 23 Pick. 49. The power given in the additional act of 1798, *c.* 16, " to purchase and hold mill seats," is merely incident to the canal, and falls with the disuse of the canal; for it is only to purchase and hold, not to take new rights under their charter without compensation; and only " as appendant to the same canal, and for the purpose of facilitating the business of the same."

The case finds that the dams of 1798 and 1826 were both raised for the purpose of supplying the canal; the surplus water only to be used by the mill. This complaint therefore, if brought while the canal was in operation, would have been barred by the terms of the charter in one year from the erection of the dam. *Heard* v. *Middlesex Canal*, 5 Met. 87. *Sudbury Meadows* v. *Middlesex Canal*, 23 Pick. 49.

The easement granted is likened to a highway, and that reverts to the owner of the fee when the rights of the public have ceased or been lost by not being used. *United States* v. *Harris*, 1 Sumner, 21. *Pritchard* v. *Atkinson*, 4 N. H. 9. Rev. Sts. *c.* 39, § 17. This canal has been wholly abandoned.

The respondents have no right to maintain the same head of water for the purposes of their mill. 1st. Not by prescription or

presumption of grant; for that can only arise from lapse of time during which the right could be prosecuted; and the grant can only be presumed from the use, which was of water for a canal, and no right to keep a dam for a mill was claimed till since the canal had been filled up, and the right had reverted. 2d. Not on the ground of damages being presumed to have been paid for a perpetual public use, of which the present use is only a continuance; for the uses are different: one for a canal to be used at all times by the whole public; the other for a private manufactory at the pleasure of an individual; and the new use more detrimental to the land flowed, inasmuch as the case finds that the canal took all the water in the dry season, when flowing would be most injurious, which water can now be kept back at the pleasure of the mill-owner. *Biglow* v. *Battle*, 15 Mass. 313. *Strong* v. *Benedict*, 5 Conn. 210. *Cogswell* v. *Essex Mill Corporation*, 6 Pick. 94.

If the respondents can take as successors of the canal corporation, the complainant has his land flowed for a mill, without having had any damages assessed to him therefor, and without any opportunity to have a jury to determine the reasonableness of the flowing and fix the height of the dam. Admitting that the corporation had the power, as intimated in *Sudbury Meadows* v. *Middlesex Canal*, 23 Pick. 49, to determine how high it was reasonable to keep up the dam for the purpose of a canal, they have never determined how high it would be reasonable to keep it for a manufactory only; and the public exigency might be very different in the two cases.

In England, property taken for one use cannot be used for another. *Bostock* v. *North Staffordshire Railway*, 5 DeGex & Sm. 584. In this commonwealth, even where the uses are so nearly similar as a turnpike and a highway, the one cannot be changed for another without a remedy, at least for increased damages. *Murray* v. *County Commissioners*, 12 Met. 455.

The case of *Chase* v. *Sutton Manuf. Co.* 4 Cush. 152, is not opposed to this view; for there the dam had been erected for a mill, before the making of the canal, at the height at which it had ever since continued, the defendant had received his entire

damages for the flowing, and the legislature had expressly authorized the sale.

*J. G. Abbott*, for the respondents.

BIGELOW, J.   There can be no doubt, that the proprietors of the Middlesex Canal, under their original act of incorporation, *St.* 1793, *c.* 21, and under the additional act of 1798, *c.* 16, by which they were empowered to purchase and hold mill seats on the waters connected with their canal, acquired, as part of their franchise, the right to flow the land of the complainant; and that this right was in its nature a permanent easement or servitude, for which the complainant or those under whom he claims title had an ample remedy in damages provided in the third section of the original charter of the corporation.   That remedy was an exclusive one, and the time within which parties could legally avail themselves of it has long since passed away.   These points have already been adjudicated.   *Stevens* v. *Middlesex Canal*, 12 Mass. 466.   *Sudbury Meadows* v. *Middlesex Canal*, 23 Pick. 36.   *Heard* v. *Middlesex Canal*, 5 Met. 81.

It seems to us very clear that there is nothing in the facts of the present case to take it out of the principles settled by those decisions, and that there is no ground on which the claim of the complainant to damages under the mill act can be sustained against these respondents.   They hold their title to the mills and water power raised by the dam which causes the land of the complainant to be flowed, under a grant from the Proprietors of the Middlesex Canal.   By the deed under which they claim, the right is expressly reserved to the grantors to appropriate the water raised by the dam at all times to the purpose of supplying their canal.   It is therefore in the right of the canal corporation, and subject to this reservation, that the respondents claim to use and enjoy the mill privileges created by the dam which is the subject of this complaint.   Unless, therefore, the corporation have surrendered or lost the right to keep up and maintain this dam, it having been already settled in 5 Met. 81, that the complainant has no claim for damages on account thereof against the corporation, it would seem to follow that he has none against these respondents, who claim under the corporation.

The sole ground on which he now rests his case is, that the canal corporation have since the year 1851 wholly disused their canal, filled up portions of it, and suffered it to remain in such condition, as to be entirely unfit for use. The argument is, that the right of erecting and maintaining a dam was granted to the corporation mainly for the purpose of enabling them to raise water for the supply of their canal, and the power to hold mills was wholly incidental to and dependent on the appropriation and use of the water raised by the dam for the great object for which the corporation was established and their franchise granted; that the corporation, having abandoned the use of the canal, and ceased to supply it with water, can no longer claim the right, under their charter, to maintain the dam.

Admitting, for the sake of giving full force to this argument, the correctness of the premises on which it rests, we do not think the conclusion drawn from them legitimately follows. An essential link in the chain of reasoning is wanting. The argument assumes that the neglect or omission to use a right granted to a corporation, as part of their franchise, for the specific purpose for which it was given, necessarily works a forfeiture of the right itself. But this is not so, unless the right is expressly made conditional on the use, which is not done in the act incorporating the proprietors of the canal. The right is given absolutely, and without express condition or limitation. The corporation are still in existence. All the rights and powers conferred on them by law, and comprehended within the broad terms of their franchise, have never yet been legally forfeited or extinguished. Nor can they be, except by a surrender of the charter and its acceptance by the government, or by a forfeiture declared by the judgment of a competent tribunal, or by proceedings under *St.* 1852, *c.* 55.

In the absence of express conditions in an act of incorporation, by which corporate rights and powers are made to depend on their due exercise, a nonuser or misuser of them does not operate as a surrender or forfeiture of the charter. Although the disuse of the canal and its abandonment by the corporation may be a gross disregard of the duty imposed on them by

law, and an essential violation of the terms and conditions implied from the contract entered into with the government by the acceptance of the charter, and, upon due proceedings had, might be a sufficient ground upon which to decree a forfeiture of all their corporate rights and privileges, they do not constitute any valid ground upon which the exercise by the corporation of any of the powers conferred by their charter can be defeated or denied by third persons in collateral proceedings. This results from the very nature of an act of incorporation. It is not a contract between the corporate body, on the one hand, and individuals whose rights and interests may be affected by the exercise of its powers, on the other. It is a compact between the corporation and the government from which they derive their powers. Individuals therefore cannot take it upon themselves in the assertion of private rights, to insist on breaches of the contract by the corporation, as a ground for resisting or denying the exercise of a corporate power. That can be done only by the government with which the contract was made, and in proceedings duly instituted against the corporation. It would not only be a great anomaly to allow persons, not parties to a contract, to insist on its breach and enforce a penalty for its violation; but it would be against public policy, and lead to confusion of rights, if corporate powers and privileges could be disputed and defeated by every person, who might be aggrieved by their exercise. Therefore it has been often held, that a cause of forfeiture, however great, cannot be taken advantage of or enforced against corporations collaterally or incidentally, or in any other mode than by a direct proceeding for that object in behalf of the government. Angell & Ames on Corp. § 777, and cases cited. *Boston Glass Manufactory* v. *Langdon,* 24 Pick. 49. *Quincy Canal* v. *Newcomb,* 7 Met. 276.

It follows from these principles, that the franchise of the Proprietors of the Middlesex Canal, which includes the right of keeping up and maintaining the dam which flows the land of the complainant, being still in existence, it is not competent for him in this proceeding to show a nonuser or abandonment of the canal, as a ground for denying the right of the corporation

to continue the dam ; and as the respondents hold their title under the corporation, and justify the flowing of the complainant's land under the corporate franchise, there is no ground for sustaining the present complaint under the mill act against the respondents. It is a sufficient answer to this suit, that the corporation have the legal right to maintain the dam as against the complainant, without payment of damages.

This view of the case renders it unnecessary to determine the question discussed at the bar, whether the right to purchase and hold mills, which was conferred on the corporation by the act of 1798, was the grant of an additional and distinct franchise or right, which may be used and enjoyed by the corporation or their grantees separately from and independently of the building and maintaining of a canal; or whether it was merely secondary and subordinate to the making of a canal and the raising of water for its supply, and was to cease and become extinguished when the right of keeping and using the canal should be surren·dered or forfeited. Nor have we occasion to decide whether the forfeiture or extinguishment of the charter of the corporation would operate to defeat the title of the grantees of the corporation to the mills and water power which had been acquired by the corporation lawfully, and conveyed to the respondents by deeds valid at the time they were made, by which the title became vested before such extinguishment or forfeiture took place. These are important and interesting questions ; but it will be quite time enough to settle them, when the exigency of a case shall require, in order to adjudicate upon the rights of parties, that they should be judicially determined.

*Complainant nonsuit.*